US DISTRICT COURT
WESTERN DIST ARKANSAS
FILED

JUN 28 2018

DOUGLAS F. YOUNG, Clerk
By
Deputy Clerk

IN THE UNITED STATES DISTRICT
WESTERN DISTRICT OF ARKANSAS

MANDY JAMES PLAINTIFF

v. NO. 18-5125

GEORGE'S, INC.,
And GLEN BALCH DEFENDANTS

**COMPLAINT**

COMES NOW Mandy James, Plaintiff, by and through counsel, Sutter & Gillham, P.L.L.C, and for this Complaint states:

**Parties**

1. Plaintiff Mandy James was at all times relevant a resident of Benton County, Arkansas.

2. Defendant Georges, Inc. is a for-profit, corporation, doing business in an industry substantially impacting interstate commerce, and employing more than 500 people in the state of Arkansas during more than twenty weeks of the year. Defendant Glen Balch was Plaintiff's immediate supervisor and is sued only for retaliation under the AMWA and the ACRA. Defendants were all employed in, or were residents of Washington, County, Arkansas. The events leading to this lawsuit took place in Washington County, Arkansas. Venue is proper under 28 USC 1391(b), and this Court has federal question subject-matter jurisdiction under 28 USC 1331, as well as supplemental jurisdiction under 28 USC 1367.

3. This is an action for violation of the Arkansas Civil Rights Act and Title VII of the Civil Rights Act of 1963, as amended, and the Americans with Disabilities Act of 1990 in the form of gender discrimination, disability discrimination, and retaliation, as well as for wrongful discharge in violation of public policy, brought in an amount exceeding that required for diversity jurisdiction.

4. Thus, this Court has personal and subject matter jurisdiction over these issues, and venue is proper. Plaintiff timely filed a charge of discrimination with the EEOC, attached as Exhibit A. She now files this action within 90 days of receiving her right to sue letter.

**General Allegations of Fact**

5. Plaintiff Mandy James is a female, who has a mental impairment in the form of Asperger's, an Autism Spectrum Disorder that impairs her ability to communicate and interact with others. Mandy James informed Glen Balch of her disability on her first day of work and explained the difficulties of communication that often lead to misunderstandings. She stated to Glen that if she ever wasn't doing something he asked of her then to please explain it in a different way to make sure she understands what she is being asked to do. He stated that he would do that. Mandy also informed Glen at this time that she has two children with disabilities who are both on the Autism Spectrum as well.

6. Defendant George's operates in the poultry industry and employs more than 300 people in the State of Arkansas.

7. Plaintiff was heavily recruited away from Tyson Foods, Inc. by Glen Balch due to the fact that George's was planning to open their first centralized Employment Center and Mandy James had been the Employment Center Manager of the Tyson Employment Center for over five years and managed the OFCCP compliant staffing of 16 Tyson locations in Northwest Arkansas. Mr. Balch went to the Tyson Employment Center to meet the manager and within a short amount of time, he gave Mrs. James a written job offer, even though she had never applied to a job at George's. Mrs. James was not seeking employment at the time Mr. Balch recruited her from Tyson Foods, Inc. Mrs. James was hired to design, from the ground-up, a "first-in-class" OFCCP compliant hiring process and Employment Center, per HR VP Glen Balch and CEO Charles

George. Charles George wanted to ability to pursue federal contracts and the only thing holding them back from that substantial company growth, was the fact that their hiring process was not OFCCP compliant.

8. At all times relevant, Ms. James performed her duties in a satisfactory manner. Mrs. James has received performance reviews before and after her employment with George's as "Excellent" and/or "Excelling".

9. After her arrival, the Corporate HR Supervisor, who was planned to report to her directly at the Employment Center, made false statements about her to numerous other employees in HR and at Corporate, saying that she had sued Tyson's three times to get promoted to her former job, that when he was completing her I-9 and introduced himself to her and said, "My name is Gabriel, but you can call me Gabe" that Mrs. James replied with, "How about I just call you asshole?", and that he heard from his contacts at Tyson, where he claimed to previously work, that Mrs. James was a "raging bitch and horrible to work with". This was told to all of the Corporate HR department, including Glen Balch, the HR departments at the local plants, the HR Manager stationed in Puerto Rico, at least one person in Sales, and the Director of IT, all within the first week of the Plaintiff's employment at George's. The Plaintiff found out around three months later when the Director of IT had worked with her on several projects and doubted the validity of the statements and told Mrs. James what had been said. It caused great humiliation and embarrassment to Mrs. James and undermined her position and credibility from the first day.

10. Before being fired from George's Inc., the Plaintiff's entire professional career and experience had been in the poultry industry in Northwest Arkansas, with the majority of her experience and expertise in Human Resources. Plaintiff holds a Poultry Science Degree and a Minor in Spanish from the University of Arkansas. This is a closely-knit industry in Northwest Arkansas, in which the Plaintiff is heavily involved, from education

to the workforce, and rumors spread quickly, beyond even the company in which the comments were made.

11. HR necessarily involves dealing with employee relations and potential allegations of discrimination and lawsuits, such that the statements made about her were extremely stigmatizing.

12. Thus, Plaintiff was somewhat ostracized and treated in a hostile manner from the beginning of her time there. Many people in HR would not speak to the Plaintiff, ignored her email requests for information, with one HR Manager calling the Plaintiff and stating that he would give me the information when Glen Balch asked for it because I was "nobody". Plaintiff repeatedly requested for Glen Balch to email all of HR and inform them of the data gathering project she had been assigned but he never would send the email. Charles George was aware of this and asked why Glen had not sent out an email yet and I stated that I did not know and that I had made that request several times.

13. During the course of doing her job, Plaintiff discovered a number of problematic issues, including a massive, systemic violations of the ADA, that also violated a settlement agreement she was told they had reached with the EEOC. Defendants implemented code 333, which denoted that applicants had a medical problem which precluded any consideration whatsoever. Since this was a blanket exclusion under the ADA, Plaintiff attempted to correct that problem and was told that it was not a problem and was forbidden from taking further action, though this was the exact sort of thing she had been hired to fix. The first day the George's Employment Center opened, one of the applicants had the code "333" in his record in Lawson, the applicant database used by George's. Heather Teague, HR Specialist, asked one of the Orientation Trainers what it meant, as they had worked at the plant, and they told her it meant the person had a medical condition and were not eligible for rehire. Mrs. Teague told me this information and I could not believe that and requested she call both local production facilities and

ask them what it meant. We received the same answer. I told Heather that Glen had to be informed so we could stop that practice immediately and for her to call him and let him know what she found and ask for steps forward. He admitted to knowing what the code meant and did not see any issue with it. Plaintiff created a document around 35-40 pages in length that contained all of the ADA, HIPPA, Code 333 examples, conflicting documentation, etc. and sent it to Glen Balch, the HR Managers at both plants, Gus Plumb and Brian Stevens, Wayne Bullington- Director of IT, Plaintiff's staff, Heather Teague and Jessica Velez, and the attorneys of The Law Group of Northwest Arkansas. Plaintiff had a conference call with Glen Balch, Gus Plumb, and Brian Stevens mid-October 2015 to discuss the document and issues brought fourth. Afterwards, Glen Balch went to the office of the Plaintiff and was extremely upset with the Plaintiff over the difficulties the issues she was bringing up were causing. Plaintiff's proposal to fix all the issues was to give everyone a "clean slate" and ignore all past work history, do not look at past application or hire notes, start fresh and document correctly and compliantly. Plaintiff made this pitch to Glen Balch, the IT Director, and the Law Group (at separate times). Plaintiff stated to Glen Balch, "I don't know why you are mad at me, you act like I just made up all of these laws, I didn't, I just happen to know them, and, I won't violate them." Mr. Balch conceded to allow me to interview an applicant with the code 333 but stated I could not hire him no matter what. Plaintiff set up the interview for Mr. Jerry Cook, almost two weeks after his original application (when other applicants were interviewed the day they applied or the next day) but Mr. Cook missed the interview. He came to the Employment Center the following day and asked to reschedule the interview and the Plaintiff was instructed to tell him no, even though we let other applicants interview after a no-show to an interview, very often. (Plaintiff created a different process using a tool called Snag-It to copy the verbiage in Lawson and digitally remove the inappropriate/illegal information from the screen before printing and putting in the Job

File and the person hiring reviews the file, so they never see it. It was the best possible solution the Plaintiff could create due to everyone involved refusing to delete the illegal data in Lawson.

14. Plaintiff discovered other violations of the law as part of her job dealing with compliance issues, including violation of EEOC laws, worker's compensation laws, immigration laws, and OSHA laws. George's was re-doing their production pay scales in order to attract more applicants and wanted to be higher paying than Tyson, their main competitor. Plaintiff was also directed by Glen Balch, on more than one occasion, to get all of the production pay scales from the Tyson plants in Northwest Arkansas. Plaintiff sent Mr. Balch an email stating that she believed his directive to be unethical and it would jeopardize the jobs of her former co-workers and she would not ask for the pay scales; and, pointed out it was against the new hire agreement she signed with George's (You are not allowed to steal proprietary information from your competitors).

15. The more the Plaintiff attempted to correct these violations, and oppose them as well, the Defendants became increasingly upset, and they began to retaliate against her.

16. Defendants fired her in retaliation.

17. Plaintiff discovered the statements made about her described above, and found out who had made them, and who repeated them.

18. Plaintiff went to Glen Balch and he ratified this behavior. Further, it was determined that he had appeared to confirm the false statements to other employees. Plaintiff complained about this to Glen Balch, but he refused to take action.

19. These statements had been made and were known to be false by the person originating them, and Glen Balch. Yet the employee was not disciplined for these statements, which were extremely serious and created a hostile work environment.

20. The employee who made these statements was male and had numerous other serious violations of company policy but had never been fired for them, despite either

being counseled, written up, or at least having these violations known to upper management, including Glen Balch. During the Plaintiff's first week at George's, this person was translating the new Drug and Alcohol Policy into Spanish. Plaintiff reviewed his translation and found many glaring and seemingly purposeful errors. When the Plaintiff asked Gabe about all of the mistakes he said, "What does it matter? No one at Corporate can read it anyway." Plaintiff explained to him that there are plenty of attorneys who can read in Spanish or could have it translated and we would be in serious trouble. Gabe said terrible things about Glen Balch to Plaintiff and stated he didn't care if the translation was bad because he didn't care about working for Glen Balch. Plaintiff re-translated the entire document and shared the conversation with Glen Balch via email. Plaintiff told Glen Balch that Gabe could not be trusted and everything else that he said about Glen, as it was the Plaintiff's first week at George's. Plaintiff stated to Glen Balch, "He is undermining your authority" to which Mr. Balch replied, "If I worried about every bad thing someone said about me I wouldn't have lasted in this job this long. You have to have thick skin to work in HR at my level." Plaintiff stated she could not work with people she didn't trust and requested to hire two people from her previous team at the Tyson Employment Center and Mr. Balch gave the approval.

21. Plaintiff was treated in a hostile manner by Mr. Balch in other ways too. When the Plaintiff asked how she was supposed to work with him at the Employment Center, Mr. Balch stated, "Gabe comes from a country where women are not equal and he's just having a hard time with having a woman for a boss. You need to include him in more decisions and make him feel like more of a part of the team." Mr. Balch also attempted to force her to ride on a long car trip with the man who slandered her, after knowing of the issues between them. Only because the Plaintiff discovered that the person spreading the vicious gossip, he claimed to get from his previous co-workers at Tyson Foods, never actually worked at Tyson Foods. He was asked about this and given time to

provide proof, but never came back. No apology was ever made to the Plaintiff by Glen Balch and no clarification was ever said to anyone in HR that the things they were told about the Plaintiff were untrue.

22. There was a recruiting issue with drivers that was so critical we were shutting down plants because we did not have enough drivers to deliver or pick-up chickens and get them to the plant, costing a large amount of money, very fast. It was a top priority for HR and the DOT department, with whom we had been working with very closely. Plaintiff created a new solution with a digital advertising campaign, never before used by George's, the cost was over $10,000 and was approved by Glen Balch, Charles George, and the Operation's Vice-President after a meeting where the Plaintiff pitched the idea. A part of this that everyone present agreed was important was that the drivers be able to reach a person whenever they call. One small, but important part, was that somebody needed to be available to take calls, if any came in from a driver at night and had questions, instead of them getting a recording. That point was one of the main points, that according to the data provided by the company we contracted to do the digital advertising, would make a difference in whether or not the driver came to work for us. Plaintiff's HR Specialist, Heather Teague, volunteered to take the calls but Glen Balch said no because he would not issue her a cell phone (although there were 100s of cell phones not-in-use at Corporate as we had just changed over to a newer model of iPhone). There were three people who work in the department where they have traditionally handled everything for DOT drivers and we had been working with one of them, Trent McKenzie, on many of the improvements we were making to the DOT process. Plaintiff spoke with Gregg Smith, the boss of Trent McKenzie, and asked him what he thought about Trent taking the calls. Gregg stated it was a great idea because Trent needed more real-world exposure to working with drivers and it would be a good project for him. Plaintiff and Gregg Smith called Trent in and told him about the idea and

he was more than happy to help. Plaintiff did not delegate a job to another person's employee, or to someone outside of the project. Plaintiff's job was managing the Employment Center, she was not a hiring or recruiting manager. Persons under her did that job.

23. Shortly before her termination, Mr. Balch contacted her via video phone and screamed so loudly the whole office could hear and insisted that she had committed some sort of infraction by doing this, even though she was acting within her sphere of responsibility by solving a recruiting problem the company had and working with related departments and chain of command in regard to personnel. He insisted she write an e-mail to all employees she had previously emailed about Trent McKenzie taking the evening calls and state that she had "screwed up", though she had not, and that she would have to take the calls at night. (A month previous to this, Plaintiff had expressed to Mr. Balch an irrational fear of answering the phone that she has that relates to her Asperger's and High Anxiety. She almost never answers her own phone or even listens to voicemail.)

24. This was essentially an attempt to put her in a trick-box. If she refused to make such a false statement, she could be accused of insubordination. If she wrote it out, Mr. Balch would then have a statement that he could claim was her admitting to making an error he could use to justify terminating her, though she did nothing wrong.

25. She was then fired a few days later.

26. Defendants claim she was written up three times. Yet they never gave her the write-ups, counseled her, or told her she was being disciplined, and the allegations in all of these so-called write-ups are false anyway.

27. Defendants claim she was fired because she could not communicate with people and could not get along with others. This is false.

28. Managers, who were male, without disabilities, or who have not opposed illegal conduct have committed sexual harassment without being fired.

29. Factory settings are not exactly known for being the most pleasant environments. If there are serious production or quality issues, people yell and curse. Managers who are male, have no disability, or who have not opposed discriminatory activities have had far worse interpersonal communication problems than anything Plaintiff was accused of, but who were not fired. Plaintiff denies ever cursing at a Board Meeting and believes Mr. Balch created this lie to damage her reputation.

30. Managers are trained to know that discrimination based on gender and disability, and retaliation, are illegal under state and federal law.

31. Accordingly, Plaintiff has been terminated because of her gender, her disability, and her opposition to discriminatory activities

## Causes of Action
## Count I – Discrimination

32. Plaintiff re-alleges the foregoing against only Georges, as if fully set out herein.

33. This is an action for a violation of Plaintiff's rights under Section 107 of the ACRA, Title VII, and the ADA.

34. Defendant Georges has discriminated against Plaintiff on the basis of her gender and disability.

35. Indeed, Defendant Georges actions have been willful, wanton, and intentional, meriting punitive damages.

36. As a direct and proximate cause of Defendant Georges acts or omissions as alleged herein, Plaintiff has lost wages and earnings, lost fringe benefits, lost earning capacity, has endured damage to her reputation, mental, emotional, and physical suffering, and has incurred expenses which would not otherwise have been incurred, and incurred other such special damages in an amount to be proven at trial.

**Count II – Retaliation**

37. Plaintiff re-alleges the foregoing against all Defendants as if fully set out herein.

38. This is an action for a violation of Plaintiff's civil rights pursuant to The Arkansas Civil Rights Act of 1993, the ADA, and Title VII.

39. All Defendants have retaliated against Plaintiff for opposing discriminatory activities in violation of Section 108 of the ACRA by discharging her and giving her false and defamatory references.

40. Those statements were false, or the extent they were true, were put in such a false and misleading context as to make false allegations against Plaintiff.

41. These falsifications were intentional, were known to be baseless, and were motivated by discriminatory and retaliatory reasons.

42. Given her profession, and the tight-knit nature of the community, these statements are extremely damaging to Plaintiff in her chosen profession as HR.

43. Such statements by Defendants tend to, or were reasonably calculated to, cause harm to Plaintiff's reputation in the community at large and the law enforcement and employment communities in particular.

44. Defendants' statements to Plaintiff Harrell's prospective employers were published out of malice toward Plaintiff Harrell and in reckless disregard to Plaintiff's rights.

45. Defendants' actions have been reckless, knowing, intentional, willful, and malicious, and are so egregious so as to warrant the imposition of punitive damages.

46. Indeed all of the Defendants actions have been willful, wanton, and intentional, meriting punitive damages.

47. As a direct and proximate cause of all Defendants acts or omissions as alleged herein, Plaintiff has lost wages and earnings, lost fringe benefits, lost earning capacity,

lost her wages, has endured damage to her reputation, mental, emotional, and physical suffering, and has incurred expenses which would not otherwise have been incurred, and incurred other such special damages in an amount to be proven at trial.

**Count III – WRONGFUL DISCHARGE**

48. Plaintiff re-alleges the foregoing as if fully set out herein.

49. This is an action for wrongful discharge in violation of public policy. It is the public policy of State of Arkansas to comply with the AMWA, safe work place laws, immigration laws, and worker's compensation laws.

50. In November of 2015, Defendants discharged Plaintiff because she opposed violation of the Arkansas Minimum Wage Act, OSHA, and falsification of training and immigration documents required under Arkansas law.

51. As a direct and proximate cause of Defendants' acts or omissions as alleged herein, Plaintiff has lost wages, lost fringe benefits, lost earning capacity, and has incurred expenses which would not otherwise have been incurred, and incurred other such special damages in an amount to be proven at trial.

**WHEREFORE**, Mandy James, Plaintiff, prays for the following relief: compensatory damages for mental, emotional, and physical suffering, damage to her reputation, embarrassment and humiliation, lost wages past and future, lost earnings past and future, loss of earning capacity, back pay, front pay and/or reinstatement, all in an amount exceeding $75,000, and only limited by what a jury determines to be a fair and appropriate amount to make her whole, cleansing of her personnel file, a positive reference, designation as rehirable, a monitor to be appointed to determine ADA compliance, a requirement that all complaints of discrimination or retaliation be kept for seven years, posting of any verdict and other relief obtained along with this lawsuit on boards at her worksite, training for managers, other injunctive relief, reasonable fees and costs, and a trial by jury.

Respectfully submitted,

SUTTER & GILLHAM, P.L.L.C.
Attorneys at Law
P.O. Box 2012
Benton, AR 72018
501-315-1910 Office
501-315-1916 Facsimile
Attorney for the Plaintiff

By: */s/ Luther Oneal Sutter*
Luther Oneal Sutter, ARBN 95031
luthersutter.law@gmail.com